IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHERMAN ANDERSON MORTON,
III and ASHLYN AIKEN MORTON,

     Plaintiffs,

v.

LIEN FILERS, ETC. OF HEATH W.
WILLIAMS, L.L.C. and
HEATH W. WILLIAMS, L.L.C.,

     Defendants.

CIVIL ACTION FILE NO.

1:20-cv-3211-TWT-JKL

## <u>ORDER AND FINAL REPORT AND RECOMMENDATION</u>

This is a Fair Debt Collection Practices Act ("FDCPA") case arising out of heated emails that two opposing attorneys—consumer lawyer Ronald Daniels and creditor lawyer Heath Williams—exchanged during a state court collection action. Plaintiffs assert that Mr. Williams's emails were abusive, misrepresented the amount of a debt, and lacked required notices and disclosures, in violation of 15 U.S.C. §§ 1692d, 1692e(2), 1692e(11), 1692f(1), and 1692g(a).  The case is before the Court on Defendants' Motion for Summary Judgment.  [Doc. 76.]  After careful

consideration of the record and the parties' briefs, and with the benefit of oral

argument, it is **RECOMMENDED** that Defendants' motion be **GRANTED**.[1]

## I.  BACKGROUND

### A.  Statement of Facts[2]

In July 2019, Plaintiffs Sherman Anderson Morton, III and Ashyln Aiken

Morton ("Plaintiffs" or the "Mortons") entered into a "Work Authorization"

contract with Tigeski, LLC ("Tigeski")[3] to perform remediation work at their

residence.  (DSMF ¶ 6; PSAF 13.)   The Work Authorization contained a fee-

shifting clause, which provided that "[i]f collection efforts are undertaken by

---

[1] Also pending before the Court is Defendants' "Request for Acceptance of Defendants' Late Filed Reply to Plaintiffs' Opposition to Plaintiffs' Response and Statement of Additional Facts," in which Defendants ask permission to file their reply brief and response to Plaintiffs' statement of additional material facts outside the 14-day response period due to a death in defense counsel's family and technical issues finalizing those filings. [Doc. 83.] Plaintiffs did not file a brief in opposition to the motion; therefore, it is deemed unopposed.  *See* LR 7.1(B), NDGa. ("Failure to file a response shall indicate that there is no opposition to the motion.").  Given the lack of opposition, the motion is **GRANTED**.  [Doc. 83.]

[2] In setting out the facts of this case, I have considered Defendants' Statement of Material Facts ("DSMF" [Doc. 76-2]), Plaintiffs' Statement of Additional Facts ("PSAF" [Doc. 80-2]), and the parties' responses thereto ("R-DSMF" [Doc. 80-1]; "R-PSAF" [Doc. 83-2]).  I also have conducted my own review of the record.  *See* Fed. R. Civ. P. 56(c)(3).  I take the facts in the light most favorable to Plaintiffs as the non-moving parties.

[3] Tigeski also did business under the name Emergency Water Removal. (DSMF ¶ 6; PSAF 13.)

[Tigeski], customer agrees to pay reasonable attorney's fees, court costs and related expenses incurred by [Tigeski] in any collection process."  (DSMF ¶ 13.[4])

A dispute arose concerning Tigeski's work.  (PSAF ¶ 18.)  In August 2019, Tigeski filed a materialman's and mechanic's lien against Plaintiffs' property.  (DSMF ¶ 7; PSAF ¶ 19.)  In October, Mr. Morton filed a notice of contest of lien.  (DSMF ¶ 9; PSAF ¶ 20.)  Tigeski then retained Defendant Lien Filers Etc. of Heath W. Williams, L.L.C. ("Lien Filers"), a law firm, to perfect its lien.  (DSMF ¶ 10; Decl. of Heath W. Williams [Doc. 76-3] ¶ 6.)  On November 12, Tigeski filed a lawsuit against the Mortons in the Magistrate Court of DeKalb County, Georgia (the "DeKalb Action").  (DSMF ¶ 12.)

Attorney Heath Williams is the managing member of Lien Filers and another defendant law firm, Health W. Williams, L.L.C. ("Williams L.L.C.")  (DSMF ¶ 1.)  According to Mr. Williams, Lien Filers is a law firm that operates in a "niche practice that exclusively represents clients entitled to file statutory liens . . . including Materialman Liens."  (DSMF ¶ 4.)  Williams L.L.C., meanwhile,

---

[4] Plaintiffs object to consideration of the Work Authorization's fee-shifting provision, arguing that it is not material to the issues before the Court.  (R-DSMF ¶ 13.)  As will be discussed below, that provision is relevant to whether Tigeski's request for attorney fees was authorized by the agreement.  Accordingly, the objection is **OVERRULED**.

"represents banking institutions, clients in real estate closings, [and] clients in various court hearing throughout the State of Georgia . . . ." (DSMF ¶ 3; R-DSMF ¶ 3.[5])  In this case, there is a dispute of fact concerning which firm Mr. Williams was acting on behalf of in connection with the events giving rise to this case.[6] Some evidence suggests that he was acting on behalf of Lien Filers, including Mr. Williams's own declaration statement that Tigeski hired Lien Filers to bring the DeKalb Action.  (PSAF ¶ 6; Williams Decl. ¶ 12.)  But other evidence indicates that he was acting in his capacity as a lawyer with Williams L.L.C.  For example, Williams L.L.C. is listed on the signature block of a stipulation of dismissal filed in the DeKalb Action.  (PSAF ¶ 10).  Though an issue of fact exists as to which entity Mr. Williams was acting on behalf of, the issue will ultimately be immaterial for resolution of the present motion.

The Mortons hired attorney Ronald Daniels to defend them in the DeKalb Action.  (PSAF ¶ 22.)  On December 11, 2019, Mr. Daniels sent a letter to Mr.

---

[5] Plaintiffs quibble with Defendants' assertion that Williams L.L.C. "primarily" represents banking institutions, pointing to evidence that it has also represented non-financial institutions.  (*See* R-DSMF ¶ 3.)  Whether or not Williams L.L.C. primarily represents such clients or not is not material to the Court's analysis.

[6] Defendants do not argue that Mr. Williams was acting on behalf of one entity but not the other.

Williams offering to settle the case for $2,000.  (DSMF ¶ 16; PSAF ¶ 23.)  The

letter read in relevant part as follows:

> My clients are willing to pay the sum of $2,000.00 to [Tigeski] in an
> effort to resolve all of these interrelated claims.  Should [Tigeski] not
> accept this offer by close of business on December 20, 2019, we will
> be filing responsive pleadings including a counterclaim against
> [Tigeski] and seeking to have the case transferred to State Court.

(Decl. of Ronald Daniels [Doc. 80-18] ¶ 14, Ex. A (emphasis omitted).)  The letter

was forwarded to Tigeski.  (DSMF ¶ 16.)  On December 19, 2019, Sue Jefcoat, an

employee of Tigeski, emailed Mr. Daniels directly, accepting the offer.  (DSMF ¶

17; R-DSMF ¶ 17; PSAF ¶ 24.)  Mr. Williams was not copied on Ms. Jefcoat's

email to Mr. Daniels.  (*See* Williams Decl. Ex. I.)

The next day, December 20, Ms. Jefcoat again emailed Mr. Daniels—still

without copying Mr. Williams—to confirm that he had received her "acceptance"

of the settlement offer.  (DSMF ¶ 18; R-DSMF ¶ 18; Williams Decl. Ex. J.)  Mr.

Daniels responded, "Received."  (Williams Decl. Ex. K.)  Three days later, on

December 23, Ms. Jefcoat replied to Mr. Daniels's email and asked for an update

on payment and a settlement agreement.  (Daniels Decl. Ex. P.)  Mr. Williams was

not copied on that email either.

On December 26, Mr. Daniels responded to Ms. Jefcoat, and asked her to

provide her attorney's email information because the Rules of Professional

Conduct require a lawyer to communicate with a represented party's attorney. (Daniels Decl. Ex. P.)   On December 27, Ms. Jefcoat responded with Mr. Williams's email address and phone number and copied Mr. Williams on the email. (*Id.*)  Two days later, on December 29, Mr. Williams himself responded, advising that Mr. Daniels may email him or call his cell phone.  (*Id.*)

On the morning of December 30, 2019, Mr. Daniels emailed a "proposed release" to Mr. Williams.  (Daniels Decl. Ex. P.)  Upon receiving the emailed release, Mr. Williams responded:

> Can you tell me why you negotiated a resolution with my client that has been represented by counsel since the outset?

(*Id.*) Mr. Daniels replied, summarizing his email communications with Ms. Jefcoat and explaining that he was unsure of Mr. Williams's email address.  (*Id.*)  Mr. Williams responded:

> I really don't care what my client did.  You knew they were represented by counsel and you communicated with them.  How long have you been practicing?

(*Id.*) Mr. Daniels replied, "I assume your client is no longer interested in resolving this matter.  We will proceed accordingly."  (*Id.*)

Not content to let the issue go, Mr. Williams responded:

> You are intentionally avoiding the point I am making which is that you had absolutely no right to discuss anything with my client

knowing they were represented and in doing so have violated several ethics guidelines.  How long have you been practicing?  I have asked once before.  I want an answer.

(*Id.*)  Mr. Daniels responded that he had been practicing since 2012.  (*Id.*)  Mr. Williams retorted, "Then should [sic] know better."  (*Id.*)

Mr. Daniels again asked Mr. Williams, to "confirm whether your client still intends to accept the terms sent to your office on December 11, 2019, by 5:00 P.M. today.  Otherwise we will proceed as advised in the letter."[7]  (Daniels Decl. Ex. P.)  Mr. Williams responded:

Go fuck yourself Ron.  At minimum [sic] you're looking at a reprimand from the state bar if this is reported.  I'll not  put up with you placing any kind of arbitrary and short timeline for me to discuss your poor office practice with my client.

(*Id.*)

The next day, on December 31, Mr. Williams emailed Mr. Daniels again, stating that he had spoken with his client and it would "accept the $2,000 and split their attorneys fees to date of $900.00" making the total proposed settlement

---

[7] As noted above, the letter "advised" that "should [Tigeski] not accept this offer by close of business on December 20, 2019, we will be filing responsive pleadings including a counterclaim against [Tigeski] and seeking to have the case transferred to State Court."  (Daniels Decl. Ex. A (emphasis omitted).)

7

amount $2,450.  (Daniels Decl. ¶ 69, Ex. Q.[8])  Defendants concede that in this communication, Mr. Williams "sought to collect $450.00 more than the $2,000 Tigeski LLC agreed to accept in settlement."  (PSAF ¶ 31.)

Mr. Daniels communicated his interactions with Mr. Williams to the Mortons and advised them that they would have to file a motion to enforce the settlement.  (PSAF ¶ 32; R-PSAF ¶ 32.[9])  On December 31, 2019, Mr. Daniels filed an answer and counterclaim, a motion to transfer the case to State Court, and a motion to enforce the settlement agreement in the DeKalb Action.  (Daniels Decl. Exs. R & S.)  Because he believed that the time for the Mortons to answer had passed and that they were in default, Mr. Daniels also paid costs to open default and file an answer.  (*Id.* Ex. R.)

---

[8] This email is not time-stamped; however, the only evidence in the record concerning when it was sent indicates that Mr. Williams sent it to Mr. Daniels at some point on December 31, 2019.  (*See* Daniels Decl. ¶ 69.)

[9] Defendants object to this statement on the grounds that Plaintiffs' cited evidence does not support the statement and that it is based on hearsay.  (R-PSAF ¶ 32.)  To the contrary, Mr. Daniels's declaration supports this statement and the statement is not hearsay because it is not being offered for the truth of the matter asserted, but instead merely to show that the substance of the emails were communicated to the Mortons.  *See* Fed. R. Evid. 801(c)(2).  Accordingly, Defendants' objections are **OVERRULED**.

8

On January 3, 2020, Mr. Williams emailed Mr. Daniels, advising that he thought the motion to enforce the settlement would not be granted, but that Tigeski was willing to settle on the terms that Ms. Jefcoat initially accepted.  (Daniels Decl. ¶ 85, Ex. T.)  Mr. Daniels responded that his clients would pay $2,000 to resolve the case, and he sent the settlement check directly to Ms. Jefcoat at the direction of Mr. Williams.  (DSMF ¶ 34; Daniels Decl. ¶ 87, Ex. U.)  On January 27, 2020, Tigeski and the Mortons filed a stipulation of dismissal with prejudice in the DeKalb Action.  (DSMF ¶ 35.)

## B.    Procedural Posture

As it turns out, the dismissal of the DeKalb Action did not end the dispute. On August 2, 2020, the Mortons, now represented by different counsel, brought this action against Lien Filers and Williams L.L.C. alleging that Mr. Williams's communications with Mr. Daniels violated the FDCPA. [Doc. 1.]  Specifically, in a single count, Plaintiffs alleged that Defendants violated the following provisions of the Act:

- 15 U.S.C. § 1692d by telling Mr. Daniels to "go f**k" himself in the email sent on December 30, 2019;

- 15 U.S.C. § 1692e(2)(A) by seeking to collect amounts Defendants were not authorized to collect, namely the $450.00 in attorney fees;

- 15 U.S.C. § 1692f by seeking $450.00 in attorney fees Defendants were not authorized to collect;

- 15 U.S.C. § 1692e(11) by not disclosing in the December 31, 2019 email that the communication was from a debt collector and was an attempt to collect a debt; and

- 15 U.S.C. § 1692g by not providing the notices required by § 1692g in any communication with Plaintiffs.

[*Id.* ¶¶ 45-49.]

On October 20, 2021, following a discovery period that could be described in the most charitable terms as acrimonious, Defendants moved for summary judgment. [Doc. 76.] In their motion, Defendants primarily argue that because the email exchange between Mr. Williams and Mr. Daniels occurred within the context of a legal action, all the communications at issue automatically fall outside the scope of the FDCPA. [Doc. 76-1 at 14-15.] Defendants next argue that because Tigeski accepted the terms of the offer on December 19, 2019, all later communications between Mr. Williams and Mr. Daniels are "irrelevant because Plaintiffs knew the alleged debt had already been negotiated and resolved." [*Id.* at 16-17.] Defendants finally argue that, even if the communications are covered by the FDCPA, each of the alleged FDCPA violations fails on its own merits. [*Id.* at 17-24.]

10

Plaintiffs oppose Defendants' motion. [Doc. 80.] They argue that litigation activities of debt collection attorneys—including the lawyer-to-lawyer communications between Mr. Williams and Mr. Daniels here—are subject to the FDCPA. [*Id.* at 14-15, 20-25.] They then argue that the debt at issue is consumer debt under the FDCPA because it arose out of transactions related to Plaintiffs' residence; that Defendants are both "debt collectors" under the FDCPA; that there is a triable issue of fact as whether both Defendants were hired to collect the debt from Plaintiffs; and that a triable issue exists as to whether Defendants violated the FDCPA. [*Id.* at 11-14, 16-20.] Finally, Plaintiffs argue that it is undisputed that they suffered injuries directly related to Defendants' actions, including emotional distress and increased legal costs and fees. [*Id.* at 15-16.]

Defendants have filed a reply in support of their motion. [Doc. 83-1.] Defendants argue that (1) Plaintiffs did not fully address or accurately cite caselaw concerning the applicability of the FDCPA to communications during the pendency of litigation; (2) Plaintiffs' damages are irrelevant; and (3) it is immaterial whether the debt at issue is consumer debt, whether Defendants are debt collectors; or what

11

efforts either Defendant made to collect a debt given the litigation and settlement context of the communications.[10] [*Id.* at 6-9.]

On May 10, 2022, I held oral argument on the motion. The motion is now ripe for review.

## II.   SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that it is entitled to summary judgment. *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929

---

[10] Defendants also "object" that Plaintiffs' response brief violates the Court's formatting rules because the top margin is less than one and one-half of an inch required by Local Rule 5.1. [Doc. 83-1 at 2.] The Court agrees that the brief violated the formatting requirements and reminds Plaintiffs' counsel that future filings must comply with the local rules.

F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the Grimes on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255.

## III.   ANALYSIS

### A.   Governing Law

"Congress enacted the FDCPA to (a) stop debt collectors from using abusive debt collection practices, (b) insure that debt collectors who refrain from such practices are not competitively disadvantaged, and (c) promote consistent state action to protect consumers from such practices." *Newman v. Ormond*, 396 F. App'x 636, 638 (11th Cir. 2010). "To prevail on an FDCPA claim, a plaintiff must establish that:  (1) he has been the object of collection activity arising from a consumer debt; (2) the defendant attempting to collect the debt qualifies as a "debt collector" under the Act; and (3) the defendant has engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA." *Osborn v. Whites & Assocs. Inc.*, No. 1:20-CV-2528-TWT-AJB, 2021 WL 6113656, at *8 (N.D. Ga. Nov. 16, 2021), *report and recommendation adopted*, 2021 WL 6113625 (N.D. Ga. Dec. 3, 2021).

"Because Congress enacted the [FDCPA] primarily to protect consumers, [courts] evaluate the circumstances giving rise to an alleged FDCPA violation from the perspective of the 'least sophisticated consumer.'" *Leonard v. Zwicker &*

14

*Assocs., P.C.*, 713 F. App'x 879, 881 (11th Cir. 2017) (citing *Crawford v. LVNV Funding, LLC*, 758 F.3d 1254, 1258 (11th Cir. 2014), and *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985)).   "The least sophisticated consumer possesses a rudimentary amount of information about the world and a willingness to read a collection notice with some care."  *Id.* at 882 (cleaned up; citation omitted).  "However, the test has an objective component in that while protecting naive consumers, the standard also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness." *LeBlanc*, 601 F.3d at 1194 (cleaned up; citation omitted).  *Id.*  The Eleventh Circuit uses the "least sophisticated consumer" standard to evaluate alleged violations of §§ 1692d, 1692e, and 1692f.  *LeBlanc*, 601 F.3d at1193, 1200-01 (11th Cir. 2010) (applying least sophisticated consumer standard to claims under §§ 1692e and 1692f)); *Jeter*, 760 F.2d at 1179  (holding that § 1692d claims "should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse").  The Court of Appeals has also assumed without deciding that the standard applies to claims under 1692g. *See, e.g., Lait v. Med. Data Sys., Inc.*, 755 F. App'x 913, 915 (11th Cir. 2018). Thus, the standard will apply in the evaluation of each of Plaintiffs' claims in this

case.  Still, as a general matter, "the question of whether the least sophisticated consumer would be confused or misled by a debt collector's communication is one for the jury." *Leonard*, 713 F. App'x at 882.

### B.    Discussion

Here, there is no dispute that Defendants qualify as "debt collectors" under the FDCPA or that the underlying object of the alleged collection activity was personal, consumer debt.[11]  Thus, the analysis that follows focuses on whether Plaintiffs have presented sufficient evidence from which a jury could conclude, applying the least sophisticated consumer standard, that Defendants' communications constituted collection activity and that Defendants violated the relevant provisions of the FDCPA.

I organize my discussion based on the communications at issue.  First, I address the first five communications between Mr. Williams and Mr. Daniels, which occurred on December 30, 2019, because, as will be discussed presently, those communications primarily reflect Mr. Williams's outrage over what he

---

[11] In their reply, Defendants contend these issues "are not material and irrelevant" to the pending motion for summary judgment. [Doc. 83-1 at 7.]  At oral argument, counsel for Defendants confirmed that Defendants do not contest that they are debt collectors or that the underlying debt at issue here involves consumer debt.

16

perceived to be Mr. Daniels's breach of his ethical duty not to communicate with a party whom he knows to be represented by counsel.  Second, I address the final communication on December 31, 2019, in which Mr. Williams proposed a settlement of $2,450—$450 more than the $2000 settlement offer Ms. Jefcoat said Tigeski would accept.

### 1.    The December 30 Emails

To prevail on a claim under any of the provisions of the FDCPA at issue in this case, Plaintiffs must show that Defendants acted in connection with the collection of a debt.  *See* 15 U.S.C. §§ 1692d (prohibiting debt collectors from "engag[ing] in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt"), 1692e (prohibiting debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt"), 1692f (barring debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt"), 1692g (requiring debt collectors to disclose certain information no later than "five days after the initial communication with a consumer in connection with the collection of any debt"); *see also Bohringer v. Bayview Loan Servicing, LLC*, 141 F. Supp. 3d 1229, 1240 (S.D. Fla. 2015) (stating that to bring a viable claim for violations of §§ 1692e, 1692f, or 1692g(a), the

plaintiff must show a "nexus" between the debt collector's actions and debt collection activity); *Sparks v. Phillips & Cohen Assocs., Ltd.*, 641 F. Supp. 2d 1234, 1244 (S.D. Ala. 2008) (stating that to establish a claim for a violation of §§ 1692d, 1692e, or 1692f, the plaintiff must show that the debt collector's conduct "occurred in connection with the collection of a debt").

As discussed, Defendants argue that the FDCPA does not apply to any of Mr. Williams's communications because they were "strictly within the bounds of a legal action." [Doc. 76-1 at 14-15.]  To the contrary, binding Eleventh Circuit authority holds that communications directed to a consumer's attorney in connection with pending litigation are not automatically exempt under the FDCPA. *See Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1277 (11th Cir. 2016) ("We see no basis in the FDCPA to treat false statements made to lawyers differently from false statements made to consumers themselves."); *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1297 (11th Cir. 2015) ("[A] debt-collector attorney's representations in court filings and his conduct toward a consumer's attorney are all covered by the FDCPA . . . .").  Indeed, the Supreme Court has held that a settlement letter sent by the debt collector's attorney to the consumer's attorney was covered by the FDCPA.  *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995).

As a result, there is no broad-brushed exception for lawyer-to-lawyer communications that occur during the course of litigation. The Court must, therefore, evaluate each communication at issue in this case to determine whether it qualifies as a communication related to debt collection.[12]

Before turning to those communications, I pause to discuss *Vega v. McKay*, 351 F.3d 1334 (11th Cir. 2003), cited by Defendants in support of their position. In that case, the court held that a complaint and summons package did not constitute an "initial communication" in connection with the collection of a debt within the meaning of § 1692g(a) of the FDCPA. *Id.* at 1336. Citing commentary from the Federal Trade Commission, the court reasoned that Congress did not intend for a "legal action or pleading" to qualify as an "initial communication." *Id.* But there is a difference between exempting the initiation of a legal action from FDCPA coverage and exempting all communications even tangentially related to litigation. Here, Mr. Williams's communications did not constitute a legal action or pleading; they were email communications. Thus, *Vega* does not extend to Mr. Williams's

---

[12] Defendants' alternative argument that all the communications at issue in this case are not actionable because they post-date Tigeski's acceptance of the offer of settlement is not supported by citations to any authority. Thus, I do not find that argument persuasive either.

emails. Indeed, this limited reading of *Vega* is supported by amendments to the FDCPA, which Congress enacted after the Supreme Court issued its decision in *Heintz,* that exclude "formal pleadings" as "initial communications." By explicitly exempting formal pleadings, and only formal pleadings, the court reasoned, "Congress did not otherwise constrain the Act's general applicability to lawyers using litigation to collect debts." *Miljkovic*, 791 F.3d at 1299 (emphasis added). In the end, the exemption recognized by *Vega* has no applicability to the communications at issue here.

That said, not all lawyer-to-lawyer communications during the course of a collection action necessarily fall within the scope of the FDCPA either. Rather, as noted above, only communications that are ***in connection with the collection of a debt*** trigger the FDCPA provisions at issue in this case. "[T]he Eleventh Circuit has not established a bright-line rule for determining whether a communication from a debt collector is made 'in connection with the collection of any debt.'" *Dyer v. Select Portfolio Servicing, Inc.*, 108 F. Supp. 3d 1278, 1280 (M.D. Fla. 2015). "[W]hen determining whether a communication is 'in connection with the collection of any debt,' courts should look to the language of the letters in question, specifically to statements that demand payment, discuss additional fees if payment

20

is not tendered, and disclose that the law firm was attempting to collect a debt and was acting as a debt collector." *Pinson v. Albertelli L. Partners LLC*, 618 F. App'x 551, 553 (11th Cir. 2015). This analysis "requires a 'commonsense inquiry' based on all factors surrounding the communication, including the 'purpose and context' of the communication." *Helman v. Udren Law Offices, P.C.*, 85 F. Supp. 3d 1319, 1325 (S.D. Fla. 2014) (quoting *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384-85 (7th Cir. 2010)); *see also Lake v. Hayt, Hayt & Landau, P.L.*, No. 1:19-CV-02457-MHC-RDC, 2020 WL 6293455, at *5 (N.D. Ga. Aug. 17, 2020), *report and recommendation adopted,* 2020 WL 6298111 (N.D. Ga. Sept. 9, 2020). "If a communication conveys information about a debt and its aim is at least in part to induce the debtor to pay, it falls within the scope of the FDCPA." *Helman*, 85 F. Supp. 3d at 1325.

Applying these commonsense principles to the December 30 emails, I readily conclude that no reasonable juror, even looking at these communications through the eyes of the least sophisticated consumer, could find that Mr. Williams's emails to Mr. Daniels were made in connection with the collection of any debt. To recap, the exchange reads as follows:

21

Mr. Williams:    Can you tell me why you negotiated a resolution with my client that has been represented by counsel since the outset?

Mr. Daniels:    The [December 11, 2019] letter was sent to your office at the address provided in your signature block in the Statement of Claim.  A copy of it is attached. On December 19, 2019, your client emailed me and stated as follows . . . .

Mr. Williams:    I really don't care what my client did.  You knew they were represented by counsel and you communicated with them.  How long have you been practicing?

Mr. Daniels:    I assume your client is no longer interested in resolving this matter.  We will proceed accordingly.

Mr. Williams:    You are intentionally avoiding the point I am making which is that you had absolutely no right to discuss anything with my client knowing they were represented and in doing so have violated several ethics guidelines.   How long have you been practicing?   I have asked once before.   I want an answer.

Mr. Daniels:    I have been practicing since 2012.

Mr. Williams:    Then should [sic] know better.

Mr. Daniels:    Please confirm whether your client still intends to accept the terms sent to your office on December 11, 2019, by 5:00 P.M. today.  Otherwise we will proceed as advised in the letter.

Mr. Williams:    Go fuck yourself Ron.   At minimum [sic] you're looking at a reprimand from the state bar if this is reported.  I'll not put up with you placing any kind of

22

arbitrary and short timeline for me to discuss your poor office practice with my client.

Each of those communications—which includes all of the December 30 emails at issue in this case—concern Mr. Williams's opinion that Mr. Daniels had violated the Georgia Rules of Professional Conduct by communicating directly with a person whom Mr. Daniels knew to be represented. They do not allege that the Mortons owe a debt, they do not demand payment, they do not discuss terms of payment, and they do not threaten future collection proceedings. *See, e.g., Lake*, 2020 WL 6293455, at *5 (concluding that debt collector's counsel's email to Mr. Daniels—the same attorney in this case—about the procedural status of a student loan collection action, in which judgment had just been set aside, and requesting responsive pleadings was not a communication in connection with the collection of a debt, as it "does not allege that Plaintiff owes a debt or is in default; it does not demand payment; and it does not discuss terms of payment or threaten further collection proceedings"). Because none of those communications can be considered debt collection activity, the Mortons' claims fail as a matter of law to the extent that they are premised on those communications.

### 2.    The December 31 Email

The final communication at issue in this case—from Mr. Williams to Mr.

Daniels on December 31—is a closer call.  In that email, Mr. Williams followed up

on Mr. Daniels's request from the day prior that he:

> Please confirm whether your client still intends to accept the terms
> sent to your office on December 11, 2019 by 5:00 P.M. today.
> Otherwise we will proceed as advised in the letter.

[Doc. 80-5.]  In response, Mr. Williams wrote:

> I've just talked to my client and they'll accept the $2,000 and split
> their attorneys fees to date of $900.00.  That would mean this would
> resolve for $2,450.00.

[*Id*.]  In the absence of any case law directly on point, and in light of Defendants'

concession that Mr. Williams "sought to collect $450.00 more than the $2,000.00

Tigeski LLC agreed to accept in settlement" (*see* PSAF ¶ 31; R-PSAF ¶ 31), the

Court is constrained to conclude that email could reasonably be understood by the

least sophisticated consumer as a request for payment of money.

Even so—and still viewing the evidence in the light most favorable to

Plaintiffs—no reasonable jury could conclude that that email qualified as debt

collection activity.  Mr. Williams's December 31 email lacks virtually all the

hallmarks of a debt collection communication.  As an initial matter, Mr. Daniels's

request that Mr. Williams confirm the settlement amount created an air of

24

ambiguity about whether settlement had been reached in the parties' minds.[13]   And

Mr. Williams's response did not affirmatively demand that payment be made, but

simply set forth a counteroffer, knowing full well that if it were not accepted, Mr.

Daniels planned to file responsive pleadings and a counterclaim in the underlying

DeKalb Action.   [*See* Docs. 80-4 (December 11 settlement letter detailing the

Mortons' actions if $2,000 settlement offer were not accepted), 80-5 (December

30-31 emails reiterating plan to follow December 11 letter if $2,000 settlement was

not accepted).]   Notably, Mr. Williams did not demand payment by a date certain,

specify how payment should be made, or include any threats of "repercussions if

payment was not tendered."   *Pinson*, 618 F. App'x at 554; *cf. Bohringer*, 141 F.

Supp. 3d at 1242 (finding letter did not qualify as debt collection activity where it

did not expressly demand payment and "contain[ed] no description of how

Plaintiffs can repay the amount owed" or "threaten any fees, costs, or other negative

consequences if Plaintiffs fail to pay the amount owed").   Viewing the "purpose

and context" of the communication from a common-sense perspective, the only

---

[13] Whether the Mortons could move to enforce the terms of the $2,000 settlement is a separate question from whether the parties believed they were still negotiating, and whether those negotiations could have resulted in a modification of the settlement terms without offense to the FDCPA.

reasonable way to interpret Mr. Williams's email is as an effort to continue negotiating the amount of a settlement payment to resolve the DeKalb Action, and not toward the collection of a debt.  For these reasons, Mr. Williams's emails to Mr. Daniels were not communications in connection with the collection of a debt and, therefore, Defendants are entitled to summary judgment on each of Plaintiffs' FDCPA claims under §§ 1692d, 1692e, 1692f, and 1692g.

Plaintiff's 1692e(2) claim[14]—as it pertains to the December 31 email—fails for the additional reason that the December 31 email did not falsely represent "the character, amount, or legal status of any debt."  15 U.S.C. § 1692e(2).  Plaintiffs argue that Mr. Williams's request for attorney fees was false and misleading because the parties had settled the DeKalb Action and, therefore, Tigeski (and Mr. Williams) no longer had any basis to collect attorney's fees under the Work Authorization.  But the problem for Plaintiffs is that at the time of Mr. Williams's email, both Mr. Williams and Mr. Daniels were unsure as to whether a binding settlement had been reached.  As noted above, Mr. Daniels's own emails bear this out.  Earlier, in response to Mr. Williams's accusation that Mr. Daniels had

---

[14] To recap, Plaintiffs contend that Defendants violated 15 U.S.C. § 1692e(2)(A) by seeking to collect amounts Defendants were not authorized to collect, namely the $450.00 in attorney fees.  [Doc. 1 ¶ 46.]

resolved the case directly with Ms. Jefcoat, Mr. Daniels stated to Mr. Williams that he "assume[d]" Tigeski was "no longer interested in resolving the matter" and vaguely threatened that he would "proceed accordingly," indicting that he thought that Tigeski and Plaintiffs had not resolved the case. [Doc. 80-5.] Later, and as mentioned above, after Mr. Williams continued to express his outrage that Mr. Daniels was avoiding the issue about having contact with a represented party, Mr. Daniels asked Mr. Williams to "confirm" by 5:00 pm that day whether Tigeski "intends to accept" the terms that Mr. Daniels sent on December 11, 2019, and threatened to proceed as set out in the letter—*i.e.*, file a counterclaim and move to transfer the DeKalb Action from magistrate court to state court. [*Id.*; *see also* Doc. 80-4.] Mr. Daniels was clearly leaving open the possibility that the settlement had not been consummated. Mr. Williams's response, then, can only be understood as either a counteroffer or at least an effort to revisit the terms of the settlement. Settlement negotiations are "inherent to the adversarial process" and, on this record, I cannot find that Mr. Williams, as counsel for Tigeski, was prohibited by the FDCPA from proposing different settlement terms to Mr. Daniels and the Mortons. *See Miljkovic*, 791 F.3d at 1307 ("If judicial disputes are to accurately resolve disputes, including debt collection disputes, debt-collector attorneys must

27

be permitted to present legal arguments in their clients' favor and to invoke the remedies available to them . . . .").  Thus, the undersigned rejects Plaintiffs' argument that Ms. Jefcoat's acceptance of the offer on December 19 meant that Mr. Williams could not engage in a continued effort to negotiate a settlement on better terms or that his doing so necessarily resulted in a misrepresentation as to the amount of the debt, particularly when Mr. Daniels had immediately before invited Mr. Williams to "confirm" that Mortons' settlement proposal had even been accepted.

Plaintiffs alternatively argue that even if Defendants were authorized to seek attorney fees under the Work Authorization, there is a question of fact as to whether Mr. Williams's misrepresented that Tigeski had incurred $900 in attorney fees litigating the DeKalb Action.  This argument is also unpersuasive.  For starters, the argument is procedurally infirm.  Plaintiffs argue in their opposition brief that a fee schedule produced by Defendants purports to show that Lien Fliers charges a $775 flat fee for cases in which the amount in controversy is between $4,001.00 and $7,000; that the total amount claimed in the DeKalb Action was $4,165.41; and, therefore, Tigeski must have incurred less than the $900 that Mr. Williams referred to in his email.  [Doc. 80 at 10.]  But this asserted fact—*i.e.,* the amount supposedly

28

charged pursuant to the fee schedule—is not contained in Plaintiffs' statement of additional material facts, and was therefore not open to objection, challenge, response by Defendants.  Under the Court's local rules, the Court will not consider a fact that is set out only in the brief and not in the statement of additional facts that the respondent contends are material and present a genuine issue for trial.  *See* LR 56.1B(1) & (2)(b), NDGa.   Moreover, even if the proffered evidence were considered, the underlying Work Authorization's fee-shifting clause calls for the recovery of not just attorney fees paid by Tigeski, but all attorney fees, as well as "court costs and related expenses incurred by [Tigeski] in any collection process." (DSMF ¶ 13.)  Thus, that Lien Fliers charges a $775 flat fee to its clients does not mean that Tigeski could not have recovered $900 in fees, costs, and related expenses under the Work Authorization, and Plaintiffs have offered nothing to suggest there were not at least $900 in fees, costs, and expenses accrued in the Dekalb Action.

But even if Mr. Williams's email overstated the amount of attorney fees that Tigeski incurred, Plaintiffs have not shown how they, much less an unsophisticated consumer, were "misled, deceived, or otherwise duped" by the Mr. Williams's statement.  "Courts throughout the country have consistently held that only material

misrepresentations constitute a violation of the FDCPA." *Rivas v. Midland Funding LLC*, 398 F. Supp. 3d 1294, 1304 (S.D. Fla. 2019) (collecting cases), *aff'd*, 842 F. App'x 483 (11th Cir. 2021). "To be 'material,' 'a statement must influence a consumer's decision or ability to pay or challenge a debt.'" *Id.* (quoting *Anselmi v. Shendell Assocs., P.A.*, No. 12-61599-CIV-WILLIAMS, 2015 WL 11121357, at *6 (S.D. Fla. Jan. 7, 2015)). The undersigned is at a loss to understand how Plaintiffs—or anyone else—could have been "misled, deceived, or otherwise duped" into paying or contesting the underlying debt by Mr. Williams's counter-proposal for attorney fees, especially where Plaintiffs themselves contend that they believed at the time they had a binding settlement agreement. (*See* Decl. of Sherman Morton [Doc. 80-16] ¶ 32; Decl. of Ashlyn Morton [Doc. 80-17] ¶ 21.) What's more, the $450 in attorney fees that Mr. Williams proposed is still less than the $750 in attorney fees that Tigeski allegedly incurred under Plaintiffs' view of the facts.

Plaintiffs' § 1692f(1) claim[15] fares no better. Section 1692f is a "catch-all prohibition" that "generally prohibits the use of 'unfair or unconscionable means

---

[15] Plaintiffs contend that Defendants violated 15 U.S.C. § 1692f(1) by seeking $450 in attorney fees they were not authorized to collect. [Doc. 1 ¶ 47.]

to collect or attempt to collect any debt.'" *Miljkovic*, 791 F.3d at 1308 (quoting 15 U.S.C. § 1692(f)(1)).  The statute also enumerates eight specific examples of unfair or unconscionable conduct, including "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt of permitted by law."  15 U.S.C. § 1692f(1).

Plaintiffs' § 1692f(1) claim suffers from flaws similar to their § 1692e(2)(A) claim.  The crux of the claim is that Mr. Williams's email proposing to settle the case for $2,450.00 sought attorney fees to which Tigeski was not entitled because the parties had settled the DeKalb Action and, thus, extinguished the Work Authorization and its fee-shifting provision.  But, as discussed above, this argument incorrectly presumes that it was a foregone conclusion that the parties had settled the case.  *See Miljkovic*, 791 F.3d at 1308 (affirming dismissal of § 1692f claim based on the debt collector's attorney's taking "a legal position contrary to that of" the consumer).  Since the Work Authorization explicitly permitted Tigeski to recover its attorney fees, costs, and related expenses of a collection action against

31

Plaintiffs (*see* DSMF ¶ 13), the Defendants are entitled to summary judgment on the § 1692f(1) claim on this additional basis.[16]

In sum, given the ongoing negotiations between Mr. Daniels and Mr. Williams; the ambiguity over whether settlement had been reached; the lack of

_____

[16] Defendants argue that they are entitled to summary judgment on the § 1692f(1) claim simply because it is based on the same conduct that forms the basis of Plaintiffs' § 1692e(2)(A) claim. [Doc. 76-1 at 19-20.] The law, however, is more nuanced than that. Defendants are correct that courts in this district have found that because "§ 1692f serves a backstop function, catching those 'unfair practices' which somehow manage to slip by the reach of the FDCPA's enumerated prohibitions," "[a] claim raised under § 1692f fails as a matter of law where the claim fails to identify any misconduct beyond that which Plaintiff asserts violates other provisions of the FDCPA." *Brown v. Credit Mgmt., LP*, 131 F. Supp. 3d 1332, 1341-42 (N.D. Ga. 2015) (Thrash, J., adopting recommendation of Baverman, M.J.). But that principle applies when a plaintiff asserts a § 1692f claim based solely on the statute's general prohibition of "unfair or unconscionable means." *See id.* (dismissing § 1692f claim that was based on same alleged harassing conduct that plaintiff used to support her § 1692d claim). Here, Plaintiffs do not premise their claim on § 1692f's catch-all prohibition against "unfair or unconscionable means." Rather, they assert that Mr. Williams's demand of $450 in attorney fees violated the § 1692f(1), which specifically prohibits a debt collector from collecting "any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). Because Plaintiffs allege that Defendants' conduct violated § 1692f(1), rather than § 1692f generally, this argument that Plaintiff's § 1692f and § 1692e claims are predicated on the same conduct is not a basis on which summary judgment may be granted. *See Eslava v. AllianceOne Receivables Mgmt., Inc.,* No. CIV.A. 12-0425-WS-N, 2012 WL 4336012, at *3 (S.D. Ala. Sept. 20, 2012) ("Case law clearly establishes that, to state a claim for violation of § 1692f, a plaintiff must either allege improper acts specifically enumerated in that section or allege misconduct beyond that which the plaintiff alleges violates other provisions of the FDCPA.").

information about actual fees, costs, and expenses incurred (and that all available evidence indicates that there were more than the $450 worth incurred); and the fact that Mr. Williams's December 31 email lacked most of the hallmarks of debt collection activity, no reasonable factfinder could conclude that the email violated §§ 1692e(2)(A) or 1692f(1).

## IV.   CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment [Doc. 76] be **GRANTED**.

It is **FURTHER ORDERED** that Defendants' Request for Acceptance of Defendants' Late Filed Reply to Plaintiffs' Opposition to Plaintiffs' Response and Statement of Additional Facts [Doc. 83] be **GRANTED**.

IT IS SO ORDERED AND RECOMMENDED, this 16th day of May, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge